The next item on our agenda is a bail motion. United States of America v. Hamlet Peralta. Morning, counsel. Good morning. May it please the court, my name is Cesar de Castro and I represent Hamlet Peralta. This court should reverse the district court for the following three reasons. First, the district court imposed a presumption of detention here and shifted the burden of proof to Mr. Peralta to establish. Didn't the court actually draw an inference that Mr. Peralta had fled and then point out that nothing was said that refuted that conclusion? That there wasn't evidence to refute that conclusion? Yes, Judge. Isn't that different than shifting the burden of proof? I don't think so. In this case, I think what the judge did was relied on the government's conclusion, a conclusion that this court does not have to rely on, that it was flight. Isn't that a factual finding? I mean, we know certain facts that are not really disputed. He's down there in Georgia living in a hotel when he's apprehended. Based on that alone, could the district court not draw a finding that he left this jurisdiction in order to avoid prosecution? You might dispute that as a factual issue, but why isn't that a fact finding that we can only reverse if clearly erroneous? I think, well, two reasons. Number one, I think it's the conclusion that is the issue and to just say that he was found in Georgia and at a hotel is not the factual record, and it is not the factual record that the court relied on to conclude that he fled. The court's reliance was that he was down in Georgia working and had left New York City after the FBI had identified him as a target of an investigation. And he had been contacted, hadn't he? He had been contacted three separate times over the course of, I believe, two years. He had left New York City. The detectives approached him, asked to speak to him, not arrest him, speak to him regarding an open investigation. He accepted that offer, if you will, and said, but I would like to do it in the presence of my counsel. Yeah, but I understand the arguments that you have, which seem to be quite reasonable arguments, that there's another set of conclusions you could draw about what he's doing in Georgia and why he left. But it's a factual question why he left. Well, it is a factual question, but when the court... And, for example, is there any actual, put aside admissible evidence, I'm used to seeing pretrial services reports where it says the defendant works for blah, blah, blah, perens verified, meaning that somebody placed a call and found out that the employer said, yeah, the guy works there. His address is he lives in Detroit. The sister says yes. There's nothing in the pretrial services reports that indicate to me that anyone checked this account, and it would be pretty easy, it seems to me, for the defendant, if he was working for somebody, to have a statement from that person saying, yeah, he was. And I'm not seeing anything like that. Now, again, I think you characterize the district court as putting a burden on the defendant to introduce evidence, but don't we have these highly ambiguous facts where the defendant has nothing supporting his account of what happened and why he's there? I think I'll answer that first, Judge, with respect to the pretrial services report. It would be easy to potentially verify that, but you shouldn't hold it against the defendant in this case, because pretrial services, there's no management. Well, it's not. I mean, I agree. I'm not holding it against him that pretrial didn't do that. I'm saying the record does not show any verification, and he did not produce any. But there the record does establish that, and the government did not disagree with me when I made a factual record and proffer at the magistrate court level as well as the Judge Forrest, I believe, that when Mr. Peralta was arrested, he was arrested by FBI agents in Macon, Georgia. He was permitted by those agents to close up his office, his office. They knew that he was working down there renovating the Bella Vista apartments. The government has produced voluminous discovery or has started to produce voluminous discovery in this case, and I believe from some of the records I've reviewed that in that evidence is going to be photographs and other evidence that established that he was working in Macon, Georgia, that he was working there. Now, at this early stage, to allow either party actually to make it a mini-trial, I think, would have been a little bit unreasonable, and from Mr. Peralta's perspective, we were trying to get a handle of someone who had just come into the district and dealt with a very serious allegation. There was a lot of fronts to challenge. I know I have only a minute left in my initial time. I'd like to address that even if the Court's conclusion on flight was appropriate and that this Court didn't want to upset the district court's decision that these facts are ambiguous, I'm not really sure, it didn't end there. And with Judge Forrest decided to end it at her determination of flight. And at — and what this Court made clear in Verios v. Verios is that if a defendant is deemed a flight risk, the presumption of bail still applies, not detention. Isn't there a difference between a flight risk and someone who has flown? In other words, there are lots of situations where, you know, you might say, oh, well, there's this or that, he's got an incentive to flee, he's a flight risk, and then, of course, you decide what conditions would defeat that risk. But where someone is found to have flown, doesn't that change the ballgame? I think it changes the ballgame if he had been charged. If he had not been approached several times about cooperation and informed that there was an investigation. This isn't the wild, wild west where the FBI says, don't leave town, you can't leave town. He is permitted to go work. And actually, his restaurant, by everybody's admission, had gone under. He had no means to support himself other than his family that is supportive of him. And so what did he do? He found an opportunity outside of the jurisdiction. He was not under any obligation to inform the FBI that he was going to make in Georgia. He was under no obligation to inform the FBI that he was going there to work on a project. What he did in the last time they approached him was reasonable. And what he did was say, if you want to speak to me, sure, come to my lawyer's office. The government chose not to. The government chose, they did not want to engage counsel at that point. It should not be held against him and it should not be deemed flight. The court, out of hand, dismissed any other options. All right, we've reserved some time for rebuttal. We'll hear from the government. Morning. Morning. May it please the court, my name is Lauren Shore and I'm an assisting U.S. attorney in the Southern District of New York. I represent the United States on this appeal. Counsel, what troubled me is that Judge Forrest couldn't find any conditions under which Mr. Peralta could be released. I think she ruled out monitoring, electronic monitoring, because she said it could be tampered with. What kind of system do we have if there's no monitoring that's available? Your Honor, I believe that Judge Forrest did consider conditions of release and rejected them after concluding that the defendant here posed a serious flight risk, based, as Judge Lynch noted, on the fact that he had previously fled after being approached by the FBI, among other factors that were present, including the fact that when he was stopped in Georgia, he had his name run through the NYPD database to see if there's any arrest warrants and things of that matter, which led to the conclusion that he had previously fled. As to the condition being— What was the— I don't follow that. Could you explain this to me? Yes. They come in a—they already find him in Georgia. No, Your Honor. Before that, he's looking for warrants. That's correct. So he was—he moved to Georgia in, I believe, August of 2015. And just to be clear, to clarify something in the record, Mr. DiCastro noted that he was approached a few times by the FBI. To be clear, in August of 2015, when he was approached by the FBI, that was not the occasion that he said, come to my lawyer's office. We'll speak to you then. In fact, he was approached. He didn't speak. Within a month, the FBI went to go look for him at his home in New Jersey. And he had, during that one month, moved to Georgia, a place where he had no prior ties. But does he have—was he working there? Do you agree he was working there? Your Honor, he might have been working there, and—but that does not mean that he had not fled there as well. He was working under his own name. He was working on his own— And he was taking interstate flights back and forth between Georgia and Florida under his own name. However, at the same— Where government officials look at the license and see who you are before you get on the plane. Yes, he was not working under a different name or an alias. But at the same time, he had left New York. He had prior ties. He had family at home. And as to your question about the stop and the NYPD and the arrest warrants, in December of 2015, he was stopped by local police in Georgia, just on a traffic violation. And soon thereafter, it came to the FBI's attention that his name was run through a database in NYPD by a colleague or friend or associate of his to confirm that there were no active arrest warrants for him. Well, there are no active arrest warrants. I mean, it's one—if he had an officer run his name and discovered there was a warrant, and instead of turning himself in, he hunkers down in Georgia, that's one sort of inference. But there were no warrants. Your Honor, I believe that it more goes to the fact that he was keeping tabs on whether or not the FBI's continued interest in him existed. This was a few months after the FBI had approached him. He had said in a phone call with an investor, in fact, who was part of this scheme, that he moved to Georgia, and I believe his language was, the federales are after me or looking for me. And so all of those facts, I believe, go to a very reasonable inference that he had gone to Georgia following the approach by the FBI to flee and continued to keep tabs on whether or not there was some law enforcement interest in him. It was only after he was stopped by local police that we learned he was, in fact, in Georgia. We did not know that beforehand. So he hasn't been charged yet. Has he in the underlying scheme? In our case, Your Honor, he has been charged. The case is pending here. Charged, meaning an indictment? There's an indictment against him at this time. The case is before Judge Forrest. Discovery is ongoing at this time. And Your Honor, as to your point about the conditions, Judge Forrest took under consideration a proposed bond that was to be secured by the defendant's sister's property, as well as electronic monitoring. As to the bond, Judge Forrest carefully considered the fact that the family members who were putting up the property were the same family members that the defendant deceived in the course of this scheme. But they were willing to continue to support him. Of course, but it does not go to the fact that the defendant necessarily was going to be deterred in any way by the fact that his family might be harmed by his flight. His family has already been harmed by his conduct. He used his sister's bank accounts in furtherance of this scheme. He lied to his sister about what he was doing in those bank accounts. And in fact, it led to the bankruptcy of her business. Now, the fact that his conduct hurt his family, hurt the sister who's putting up property, did not deter him in continuing that conduct. And I think there's- And yet she was still willing to put up her property. She was, but it doesn't necessarily mean that the defendant would also be given incentive to stay by her property being put up and her financial position being put at risk. Was there a bond amount for him to post? I believe that in the magistrate court, the bond amount was $5 million, with a $1 million security to be secured by cash or property. I believe that Mr. DiCastro had proposed a $500,000 bond in his bail modification request. And you would say that his removal of himself from here to Georgia is what distinguishes the package that had been made available to defendants in similar kinds of schemes from this situation. Is that right? Yes, Your Honor. I believe that his removal to Georgia and then his conduct following his removal to Georgia, including the continuing to check on the fact, or at least on one occasion, check on the fact that he did not have a warrant against him and the fact that he made mention of the Federales being after him, moving to a place that he had no prior ties, does distinguish this case from other cases where bail packages were proposed. He has a prior history of flight, and there continues to be a flight risk here, given that he's now charged in a very serious offense, facing seven to nine years in jail now. And he has previously fled when law enforcement expressed interest in him and in this case. Previously before going to Georgia? No, Your Honor, in reference to the Georgia flight. It is part of the United States. It is part of the United States, that is correct. That is the place he fled. Of course, he could have fled to other places. He has family in the Dominican Republic, but we have no proof that he fled. And he turned over his passport, didn't he? He has turned over his passport, yes. Unless the panel has any further questions, we will rest on our feet. Thank you, counsel. Mr. DeCastro, you have two minutes for rebuttal. Thank you, Your Honor. Two quick points, or maybe three, but one thing you're not hearing from the government with respect to when he was approached and that he fled, was that he was a target of the investigation. You didn't hear anything from them today and you don't see it in the record where he is a target of an investigation. So even if the court were to conclude that he was fleeing New York, which I don't think the record supports, he was fleeing as a witness? He was fleeing as a party that the government truly wanted to use against others? Are we really going to find that that is a person where there's no set of conditions where that person could be released on a bond? Judge Pooler, you mentioned the family is willing to support him. The family is supporting him today. They're in this courtroom today. The fact that his sister is alleged to have been used in a scheme is an allegation. Simply that. And they are supportive and willing to put up a property. But what you saw in the district court was the court wasn't even willing to say, well, listen, I'm uncomfortable with that property. I'm uncomfortable with the sister putting up the property. Perhaps a different property. Perhaps a dollar figure. Perhaps electronic monitoring, which the pretrial services office of the Southern District of New York is incredibly good at. I think the numbers, the statistics, which are not before the court's record of flight are minimal. And Judge Farr said that it could be tampered with? It could be tampered with. I believe she said it could be cut off. And so she considered, she gave that very, very little consideration. She also made a comment regarding the property. Well, the property is insufficient because for all I know, it's being foreclosed upon. I had made a representation originally before Judge Moss that I believe there was somewhere in the neighborhood of $300,000 of equity. That number, I think, actually increased after I had some time to actually speak to. Is it being foreclosed against? No, it is not. Did you put in an affidavit to that effect? I did not put in an affidavit to that effect. I didn't have that information. I'm still awaiting an appraisal report. These are the preliminary stages of the case in which the defendant is presumed innocent. Well, why don't you get to go back? You still have the option to go back to the district court with more information, right? I suppose I could ask her to reconsider. Well, it would be a new application. If you have the appraisal, for example, I'm not suggesting that that's controlling or anything, but one of the things that's awkward about bail appeals and indeed about bail setting is that on the one hand, nobody's supposed to be kept in jail because they can't make the bail. It's only if there's no condition that can hold them. On the other hand, the conditions that they are able to make might not be ones that are able to hold them. And so there's a kind of negotiation process between what might be the ideal conditions that hypothetically could hold somebody and what they can reasonably make up. All I'm suggesting is that even if we were to affirm on this record, that would not control what happens on a different and fuller record. I think that's right. Quite frankly, Your Honors, I think on this record that I could have gone back before Judge Forrest. What's striking to me about that proceeding was that what you find is when it is the government's burden, you find that I am engaged in the court mostly. The court was more interested in my back and forth with her. That there's some intangibles to an appearance before a court that can't be reflected in the record. I think it's futile. There is no set of circumstances that I could present. I could bring in document after document to this district court, and I don't think there's any chance Mr. Peralta is going to be afforded bail. She made her comments in the record that she would have sua sponte if she had learned facts, gone in and made a and had a bail application, apparently even if we had agreed to a package. So I think it's futile. But that's what judges do. That's what they're supposed to do, is make their own indetermination and not yield to the government. But it's what she said, it was based on what the government's information that she had provided. Nothing that I had proffered, only that the government had produced information that she wanted to know. And that's where I think this Court could hold that this was a proceeding where the defendant had to prove he was not a flight risk. That is not what the Bail Reform Act embodies. That is not what the presumption of innocence applies. He should not be sitting at the MCC right now with no bail package. I didn't say ROR. I said a bail package that would be difficult for the family to make that would ensure his return here. Thank you. Thank you, counsel. Thank you both. We'll reserve decision.